## THE BRILLIANT.

(District Court, E. D. of New York. June 5, 1905.)

1. SHIPPING—INJURY TO CARGO—SEAWORTHINESS.

A ship had a distribution box in the pumproom, containing three valves; one closing a pipe leading into a water-tight tank usable for cargo or for water ballast. Such valve was controlled by a spindle, and could be used to fill or empty the tank, but, when the spindle was disconnected, became a nonreturn valve, through which the tank could be pumped out, but which would not permit water to enter. There was a pipe connecting the distribution box with the sea, containing a sea valve. On the termination of a long voyage at New York, it was found that sea water had entered the tank, and damaged sugar cargo stowed therein. A survey showed that the sea valve had become incrusted and leaked slightly; also that the tank valve was obstructed by a stick five inches in length, which prevented it from closing tightly. There was also evidence that the spindle was unshipped. *Held*, that whether or not it was so disconnected was immaterial, since, if it was, the valve was equally effective to prevent the entrance of water, and the ship would not be for that reason unseaworthy. *Held*, also, on the evidence, that the obstruction lodged in the valve while the pumps were being tried during the voyage, and that the ship was not unseaworthy at the beginning of the voyage because of the defective condition of either valve; it being shown that they were properly constructed, and were in good condition at that time.

2. SAME—FAILURE TO USE DUE DILIGENCE IN EQUIPMENT.

A ship was equipped with a tank usable for cargo or water ballast, into which extended a pipe 5½ inches in diameter, reaching nearly to the bottom, and having its lower end open. This pipe could be connected by valves with the sea, and was used both for filling the tank and pumping it out. During a voyage on which sugar was stowed in the tank, the valve closing such pipe became obstructed by a stick 5 inches long, which the evidence tended to show was drawn into the pipe from the tank when the pumps were being tried; and sea water entered through the opening, which damaged the cargo. *Held*, that the failure to place a rose or screen on the lower end of the pipe to prevent the entrance of foreign substances which might foul the valve was a failure to exercise due diligence in equipment to make the ship seaworthy at the beginning of the voyage, and which rendered her liable for the damage, under section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. p. 2946]).

[Ed. Note.—Statutory exemptions of shipowners from liability, see note to Nord-Deutscher Lloyd v. Insurance Co., 49 C. C. A. 11.]

**3. SAME—EXEMPTION BY BILL OF LADING—PERILS OF THE SEA.**

  A ship cannot by bill of lading exempt herself from liability for damage to cargo from sea water, as a peril of the seas, where such water entered because of the obstruction of a valve, due to the failure to exercise due diligence in the equipment of the ship at the beginning of the voyage.

  [Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 493–499.]

In Admiralty. Suit to recover for damage to cargo.

Butler, Notman & Mynderse (Wilhelmus Mynderse, of counsel), for libelants.

Convers & Kirlin (J. Parker Kirlin and Charles L. Hickox, of counsel), for claimant.

THOMAS, District Judge. The bark Brilliant, launched in April, 1901, at Scotland, going thence to New York, Yokohama, Sourabaya, Pasorean, and back to New York, has a fore peak separated by a collision bulkhead from the fore hold, aft of which is a water-tight tank, usable for cargo or water ballast, and aft of this were other spaces, not here involved. In the forward part of the tank is a pumproom or well tank 8 feet and 4 inches by 10 feet, extending from the bottom of the ship to the top of the tank, and accessible from the deck. In the pumproom is a distribution chest, raised about 7 or 8 feet above the bottom of the ship. It is 4 feet 3¼ inches athwartships, 10¼ inches fore and aft, and 7¾ inches deep. In this chest are three valves—the tank valve on the starboard side of the chest, the well valve on the port side, and the forehold valve between the two. Another valve (the sea valve) is located on a pipe or casing about 3 feet 6 inches above the bottom of the ship, opening downward towards the sea, and upward through a pipe to the distribution chest. Each of these four valves is related to a rod or spindle extending to the between-decks, which is operated by a wheel. The lower end of the spindle is not attached to the well valve or fore-hold valve. When screwed down, the spindle of either the well valve or fore-hold valve presses upon the top of such valve so as to keep it closed, but when the spindle is released such valve may be raised by the suction of the pump, so as to draw out any water that may be in the well or fore hold, but does not allow water to be pumped into either of these spaces. The lower end of the spindle going to the tank valve has a circular head that slips into a horseshoe-shaped collar on the top of the valve. When the spindle rises or descends, the valve, if in normal relation, rises or descends with it. This valve has a beveled edge, has 5½ inches interior and 6¾ inches exterior diameter, and extending downward from it are four legs, about 2½ inches long, that enter the circular metal chamber, on the top of which the valve rests when closed. When the lid over the valve is bolted in place on the top of the chest, the valve cannot be raised so high as to permit these legs to escape from the mouth of the chamber, and thereby the valve is prevented from having any lateral motion that would cause disconnection of the valve from the spindle. The

chamber extends downward from practically the bottom of the chest for a distance of 5 or 6 feet, where at a point about 18 inches above the bottom of the tank it penetrates the bulkhead of the tank, whereupon it connects with a pipe, understood to be 5½ inches in diameter, that, bending downward, extends in such tank to within an inch and a half of the skin of the ship. The end of this pipe is in a box 2 feet long and 4 feet wide. Two of its walls are two of the iron floors or beams that extend across the tank, while its other sides are two plates connecting such two floors. There are limber holes in the sides composed of the floors, and small perforations of one-half to three-fourths of an inch in diameter in the other sides. There is no rose or screen at the end of the pipe. When it is necessary to fill the tank the sea valve and tank valve are opened, and the water runs through the sea valve and its upper pipe to the chest, thence through the tank valve, its chamber, and continuing pipe to the ballast tank, until the water within the tank has reached the sea level. Then both valves are closed, and the tank filled from above by the pumps. When it is necessary to empty the tank, the sea valve and tank valves are opened, and, after the water has run down in the tank to the sea level, the sea valve is closed, and the remaining water is pumped out through the tank valve into the distribution chest. The well and fore-hold valves are called "non-return valves," which may be used to pump out, but not to pump in. While the ballast-tank valve may be used to fill or empty the tank, yet, if the spindle were disconnected from the valve, the latter would then become a nonreturn valve, capable of performing the duty of such a valve—that is, to pump out—as it weighed 8¼ pounds, or 1 pound more than the fore-hold valve. In the top of the distribution chest are three circular openings, and over each opening is a metal plate or lid, held in place by cement and four tap bolts—one at each of its corners. Each lid acts as a stuffing box, and the spindle passing through it works on a thread, so that it screws up to release the valve, and down to close it; but while the lid is closed and bolted the spindle cannot be raised sufficiently to allow the tank valve to unship from its end, nor can it be displaced by a person inserting his hand in the chest, because the legs of the valve cannot be raised clear of the seat, as already stated, nor can the spindle be carried out of its normal line. But if the lid be unscrewed and raised about half an inch, the spindle can be carried to one side, and such disconnection effected.

Upon the arrival of the vessel at New York, it was found that there were about 19 inches of water, of about 30 tons' weight, in the ballast tank, and that the upper surface of such water was about awash with the upper sides of the transverse iron floors. On these floors removable sectional ceiling was placed, and on this sugar in baskets was stowed in tiers. The water did not reach the bottom of the baskets of the lower tier, but the motion of the vessel had brought it in contact with the bottom of the baskets, injuring the sugar, and to recover damages for such injury this action was brought.

When the hold was opened for the discharge of the sugar there was no visible evidence of injury, and it was not until the lower tier had been reached that damage was discovered. Such investigation as then could be made did not reveal the cause of the injury. Thereafter the vessel was placed on dry dock, where it was discovered that there was a very slight leak from the sea valve. A trial of the wheel showed that this valve was closed as tight as possible, but its removal disclosed that its face was foul—a condition probably caused by shell or other adhering substance. Thus the salt water had passed through the sea valve up into the chest. But even then it could not escape into the ballast tank, had the tank valve been closed; and it was evident that there must be some defect in the ballast-tank valve, and that such defect must have existed for some time. Therefore the surveyors, to wit, McDougal and Davies, representing the cargo, and Herbert, representing Lloyds Register, went into the pumproom where the chest is located; and thereupon McDougal, acting as machinist, removed the tap bolts, pried up the cemented lid, and raised it and the spindle. When the spindle and lid were raised, it was found that the valve was unshipped, according to the evidence of McDougal and Davies, although Herbert and the captain of the vessel gave evidence tending to contradict that of McDougal and Davies. In any case, after the spindle was raised McDougal took hold of the valve and attempted to raise the same, but was unable to do so until he used some instrument to loosen it. Also a stick about five inches long was found, which had been jammed between the face of the valve and its seat. Marks upon it show that it at some time had rested on the seat, where it was pressed by the face of the valve. Inasmuch as the surveyors, by trying the wheel on deck, found that the valve was tightly closed, the presence of this stick slightly raising it furnished the opening through which the water coming from the leaking sea valve into the chest passed into the ballast tank. McDougal and Davies reported that the valve was unshipped, was jammed, and that a stick was beneath it. Herbert did not report that the valve was unshipped, but that it was jammed.

The claimant, among other defenses, invokes the third section of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]).

Could the accident have happened without the concurrence of three conditions: (1) The sea valve slightly opened; (2) the tank valve disconnected; (3) the stick under the valve? It is obvious that the accident would not have happened, had not the sea valve been open, as that furnished the more immediate access to the sea. Whether the tank valve was disconnected or connected, the stick had equal opportunity to get between it and its seat, for, whether the valve was disconnected or connected, it would press down upon the intervening stick by the operation of the spindle. It, if disconnected, would be a nonreturn valve, like the well and fore-hold valves; and, saving for a slight increase in its weight, the tank valve would open and close as do such nonreturn valves. There

would be this difference in advantage between the tank valve connected and disconnected. If connected, it would press upon a stick, and when thereafter raised at St. Helena, and the pump worked to test the tank, the valve would be raised higher, and give more space for the suction to carry the stick away, and the opportunity, in point of time, would be increased, because, if the valve were disconnected, the suction of the pumps would raise the disconnected valve spasmodically, so that it would be raising and closing at such short intervals and to such lesser degree that the stick would not have the same time or space to escape as where the connected valve is drawn up. Moreover, if the valve were connected, and if it could be jammed by the stick so as to hold it down with considerable force, yet the raising of the spindle would relieve the jam, while, if it were disconnected, the suction would be less efficient to raise the valve if so jammed. So, also, if connected the valve could be raised, and the condition of the tank tested by the pump, while, if disconnected and in fact seriously jammed, the use of the pump would perhaps cause some water to rise from the tank; but it would be comparatively slight, and would tend to mislead the operator, and cause him to think that the tank was substantially free from water. But assume that the tank valve had been originally made a nonreturn valve; should it be the subject of criticism, any more than the fore-hold valve? Such a valve would not allow water to be pumped into the tank; that is, a nonreturn valve prevents water from entering the tank. The accusation here is not that water did not enter the tank, but that it did. Now, if a nonreturn valve will not allow water to enter, how can it be said that the valve, simply because it became a nonreturn valve, was a proximate cause of the injury? For pumping out it was just as good as the other nonreturn valves, except that it weighed one pound more than the fore-hold valve, and there is no evidence to show that such additional weight would preclude its useful operation either for pumping out the tank or testing its condition. If the owners had made the tank valve a nonreturn valve, as it became if disconnected, it is difficult to hold that this would have rendered the ship unseaworthy. But the presence of the stick was an essential condition of the injury. If the sea valve were wide open, the water could enter the chest, but it could go no farther, if the tank valve, connected or disconnected, were closed and pressed down by the spindle. But the stick, if interposed between the valve and the seat, left a space through which the water could pass.

It will be considered how far the owners, either through themselves or their agents or servants, failed in their duty to make the ship seaworthy.

The ship was put on dry dock at Yokohama, and the sea valve examined and found to be in good condition, and so it was in good condition at New York, save that its face was slightly fouled by "grit," "corrosion," "bit of shell," or "sea growth" (using the descriptive terms of the witnesses), so that one could "hardly get the point of a knife in," through which there came a "slight weep,"

"small weep," "a drip," "a small drip," "in drops" (again using the descriptive words of the evidence). This valve specifically could be examined only when the ship was on dry dock, and duty, in the absence of actual or constructive notice, did not require that the ship should be docked again at the subsequent ports. But the mere impossibility of docking emphasizes the demand for other tests, or the observance of other conditions that might indicate whether the sea valve was in good order, and the necessity for protecting the valves in the chest against impeding substances. The claimant seems to suggest that the heavy weather off the Cape of Good Hope may have caused the sea valve to work "open a trifle." If a sea valve was subject to disturbance from such cause, or to fouling when opened, as at Yokohama and Sourabaya, the diligence required of the owners in fitting the ship and inspecting her at the loading ports would be somewhat measured thereby. But as regards the sea valve itself, it is concluded that the owners did all that their duty required.

The next inquiry relates to the question whether the tank valve was disconnected, and if so, when. There is some contention, based upon conflicting evidence, as to whether the carpenter, for purposes of cleaning, removed the tank valve at Yokohama. It is quite unimportant whether he did or not, as it is evident that the tank valve was not disconnected at that port, even if the carpenter removed and replaced it there. For if he took the valve out and replaced it before the tank was filled with water at Yokohama, he must have replaced it correctly; otherwise the tank could not have been filled, for it is beyond question that, while the tank could be pumped out with a disconnected valve, it could not be filled with a disconnected or nonreturn valve. Hence the valve was connected when the tank was filled at Yokohama. The carpenter could not have removed the valve at all after the tank was filled at Yokohama, as the pressure of the water in the tank, at least, if it was above the top of the chest, would force the water into the chest and deluge the pumproom. There can be no conception of such rash action on the part of the carpenter. Therefore when the ship sailed from Yokohama the tank valve was connected. From Yokohama the vessel went to Sourabaya, where the tank was emptied. There are satisfactory reasons for concluding that the tank valve was not disconnected at that port. It could not be disconnected unless the separate lid of the chest over the tank valve was taken off. This required the removal of four tap bolts, the prying up of the lid as McDougal did it at New York, the raising up of the spindle, threaded through the lid, for the distance of half an inch, and then the carrying of the spindle laterally so as to disengage its end from the horseshoe-shaped collar of the valve; and this must be followed by error in attempting to readjust the valve. There is no evidence that this was done. The evidence of the carpenter is that he did not uncover the valve at Sourabaya, but did remove the lid of the fore-hold valve and feel all the valves, and that the tank valve was in place, and that there was no stick under it. Upon an earlier ex-

amination the carpenter testified that at Sourabaya he took off the lid of the well valve to feel the tank valve. This was an impossibility. He subsequently testified that it was the lid of the fore-hold valve that he lifted, whereby his hand could be inserted. This he could do. This change of testimony is urged against his credibility. But it is thought that the error does not have that effect. His mistake may have arisen from the fact that the plan of the ship shows that the tank valve was in the middle, where it could be reached from the well valve. In fact such tank valve is on the starboard end of the chest, and the fore-hold valve is in the center. But he probably misnamed the valve through sheer inadvertence. There is much temptation to such error. Indeed, the learned counsel for the libelant in his brief states that the tank valve is on the starboard end, the fore-hold valve at the center, and the well valve near the port end; and again, on the same page, he speaks of the "fore-hold valve at the port end of the chest," and of "the well valve in the center of the chest." The carpenter, in the excitement of an unaccustomed examination, might well make a statement similarly inadvertent. The carpenter's experience, the trust reposed in him by his employers, and his appearance as a witness, do not indicate, and the known impossibility of reaching the tank valve from the well valve makes it improbable, that his first designation of the valve uncovered by him was other than accidental. Even if his evidence that he felt of the tank valve were open to suspicion, it would not authorize a conclusion that he dismantled the tank valve at Sourabaya, for there is not the slightest evidence to that effect, and it would be a physical impossibility to disconnect the tank valve from the spindle unless he did take off the lid as above described. The ship was new, with a first-class registry, and having gone first from Scotland to New York with water ballast in the fore tank, where the tank was emptied, took therein case oil, which she carried to Yokohama. The carpenter states that he did not uncover the tank valve, and there is nothing to discredit such evidence, unless it be that the valve was, as alleged, found disconnected at New York. It was connected at Yokohama, and its continuing connection at Sourabaya and Pasorean is a presumed fact. Moreover, when the water was pumped out at Sourabaya after having reached the sea level, the valve, if disconnected, would not act as freely, and, especially if disconnected and jammed, a very limited quantity of water would pass through it, and in the opening and closing the valve the carpenter would be likely to notice the lessened revolutions of the spindle. Such conditions would tend to attract attention. Again, if the valve had been disconnected and jammed at Sourabaya, the water would, if the sea valve leaked, have entered the tank after the tank had been emptied, cleaned, dried, and had received two coats of cement; and the officers and Lloyds surveyor who inspected it would at least have had some opportunity to notice it, and the carpenter examining the chest would have discovered the water in it. It is true that the water coming in at that port would have been comparatively

inconsiderable, and after the floors were laid it might have escaped notice, especially if cargo were loaded in the fore tank. These considerations lead to the conclusion that the valve was not disconnected at Sourabaya, and that it was not then impeded by the stick. It is possible that, when the valve was closed after the tank was emptied at Sourabaya, it closed down on the stick, the sea valve being then closed tight. But the carpenter states that he felt of the valve after the tank was emptied at Sourabaya, and that it was in place, and no stick was under it; and, in the absence of contradiction, that evidence has much force. There is no evidence that the valve was opened after the ship left Sourabaya. It is believed that the tank valve was not then obstructed, and in such case it would not admit water, whether it was connected or disconnected. That condition would continue at Pasorean. The tank valve was opened by the spindle near St. Helena to test whether there was water in the tank. There was then an opportunity for the stick to enter, and it is believed that the stick did enter at that place, because the evidence shows that it is improbable that it was in the valve before. Had it been jammed in the valve at an earlier time, it would have cleared at St. Helena, certainly if the valve were connected, probably if the valve were disconnected, unless the valve were closed so hard upon it that the valve could not raise; and it is difficult to understand how the stick could get between the valve and the casing, so that the valve would not raise when the pump was in operation. If an attempt be made to insert the stick, so as to prevent the valve raising, the improbability of the stick holding down even a disconnected valve against the suction of the pump will be appreciated. But the stick may have got into the tank from putting down the ceiling, or in loading the baskets, and the suction would draw it up into the valve. But it probably reached its final position when the valve was closed, after pumping at St. Helena, and thereafter held the valve open so that the disturbed sea valve allowed the water to enter. The libelant urges that the tank valve was found disconnected at New York, and alleges that as a fault. But it is thought that such disconnection, if it existed, shows no fault. As already stated, a disconnected tank valve becomes a nonreturn valve. It is just as useful to keep water out as a connected valve. Its defect would be its inability to let water in. It is as serviceable to keep water out as the well or forehold valve, and it would be no more fault to make it a nonreturn valve than to make the other valves nonreturn valves. A stick was practically no more apt to get under this valve than the other valves. The mischief was caused by the stick and the sea valve. Even the sea valve would have been sufficient, if closed. But a sea valve properly made, as this was, and inspected so far as practicable, as this was, and a nonreturn valve, as this was if disconnected, screwed down, as this was, would have kept the ship tight, had not the stick entered. But was the valve disconnected at New York? Looking only at the evidence relating to the dismantling of the tank valve at New York, there could be no hesitation

in finding that the valve was unshipped there. The evidence of McDougal and Davies, surveyors, far outweighs the evidence of Herbert, surveyor, and the captain. Any one reading the evidence would have no difficulty in reaching this conclusion. It is true that the pumproom was contracted, and was not very light. But McDougal states that it was sufficiently light, and he and Davies testify that they did see, that the spindle came up alone, that the valve remained in its seat, and that McDougal was obliged to use some instrument to pry it loose. But what is the result? The evidence, direct and circumstantial, is persuasive that the valve was not disconnected when the voyage began, either at Yokohama, Sourabaya, or Pasorean. Hence the situation is this: (1) The valve was not disconnected, and in that regard the ship was seaworthy at the inception of the voyage; (2) the evidence of libelants' witnesses who were present when the valve was removed at New York, preponderatingly shows that it was disconnected at that place. Hence it must have been disconnected, if disconnected at all, en route; and this exculpates the ship, so far as the alleged disconnection is concerned.

But if it becomes necessary to make choice between the evidence as to condition when the voyage began and the evidence of condition at New York, it is considered that the evidence of the earlier condition should be preferred. For there is a chance that McDougal and Davies were mistaken, while the circumstantial evidence, supported by the evidence of the carpenter, precludes the conclusion that the valve was disconnected either at Yokohama or Sourabaya, and this conclusion is reached, wherever the law places the burden of proof. However, it is thought that the fact is immaterial, as the ship, for purposes of keeping out water, was just as seaworthy, whether the valve was connected or disconnected, and that for pumping purposes it was sufficient.

But it is considered that the absence of a rose at the end of the pipe in the ballast tank shows that the owners did not use due diligence to make the ship seaworthy. There seems to be a consensus of opinion that the stick came from the tank. The holes in the floors were quite large enough to admit the stick to the pipe. The suction of the pumps was sufficient to draw it up into the valve, where it lodged. Now, is a ship properly constructed that allows such impediments to be drawn into a chest containing three valves, to become lodged in a valve, and to hold open such valve, with the result now present? The sea valve was subject to leak. It could not be examined except when the vessel was dry-docked. Heavy weather might open it. It was vital, then, that the tank valve should be kept free so that it could be closed; and yet the end of the tank pipe was open, so that a stick five or six inches long was drawn through it. When it got in, how long it had been in the pipe, is not important. The event shows that it did enter. The tank was used for water ballast, and this use allowed obstructive material to enter, such as "muck," as the captain suggests. It was important that this material should not get into the pipe so as to

clog the valves, and yet there was nothing to prevent. Limitation of size of the foreign material was the only protection. This stick was not too large. The valve was to be used not only for pumping out the tank before loading, but also for removing any water that might get in after loading and during the voyage. The powerful pumps that would lift a nonreturn valve weighing seven or eight pounds could well draw up substances of considerable size that would lodge in the pipe, and against them there was no precaution whatsoever. It was the duty of the crew to pump on the voyage, but the performance of this duty might effect the obstruction, and then there would be nothing between the cargo and the sea save a sea valve incapable of examination. So, when the pump was dutifully worked near St. Helena, it probably drew the stick into the valve, and thereupon the valve was closed upon it.

But it is urged by the claimant that the bill of lading exempts the ship from liability for injury arising from "peril of the seas"; that the damage to the cargo was from a peril of the sea, and hence within the exception. The proposition, applied to the present question, is that a shipowner may so construct his ship as to allow the sea to enter, and, yet be free from liability, because the entry of sea water is a peril of the sea. If the claimant intended to go as far as that, his position should not be maintained, as it would enable the owner to lay aside his duty to make the vessel seaworthy, or to use due diligence therefor.

Upon the sole but sufficient ground that the pipe in the tank was not properly screened, the libelant should have a decree.