### THE R. P. FITZGERALD.

(Circuit Court of Appeals, Sixth Circuit. January 16, 1914.)

No. 2390.

1. SHIPPING (§ 136*)—LIABILITY FOR INJURY TO CARGO—HARTER ACT.

Before a vessel owner can avail himself of the provision of section 3 of Harter Act of February 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), exempting him from liability for loss or damage to cargo from faults or errors in navigation or in the management of the vessel, he must show that the vessel was seaworthy at the commencement

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the voyage, or that he exercised due diligence to make her so, which is made a condition precedent to such exemption.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 136.*]

2. SHIPPING (§ 136*)—LIABILITY FOR INJURY TO CARGO—HARTER ACT—DILIGENCE TO MAKE VESSEL SEAWORTHY.

In exercising the degree of care and diligence imposed on an owner to make his vessel seaworthy by Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), he will be required to take such precautions as are reasonably adequate for the protection of the cargo against known perils, or which reasonable foresight may have anticipated.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 136.*

Statutory exemptions of shipowners from liability, see notes to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11; Ralli v. New York & T. S. S. Co., 83 C. C. A. 294.]

3. SHIPPING (§ 138*)—LIABILITY FOR INJURY TO CARGO—HARTER ACT—SEAWORTHINESS.

A steamer carrying a cargo of wheat in bulk on the Great Lakes had a lamp room situated directly over the cargo, in which was a 60-gallon tank of kerosene in daily use. The room was lined with zinc, and the sheets on the floor and for a distance up the sides were soldered together so as to be liquid tight. The floor sloped down toward one corner where the opening through which an exhaust pipe came up was also made tight, but a live steam pipe for use for fire protection, put in later, was left with an open space around it unprotected. A seaman in cleaning the oil tank apparently loosened a seam in the bottom causing it to leak, and the oil ran through the space around the steam pipe causing damage to a part of the cargo. *Held*, that the danger of injury to grain from the leaving of such opening in the floor was so obvious, as evidenced in part by the care originally taken to make the floor tight, that the owner could not be said to have exercised due diligence to make the vessel seaworthy for such a cargo, even though other vessels of her class were similarly constructed, and she had been passed by inspectors and surveyors and given a good rating, and that, conceding that the negligence of the seaman was the proximate cause of the damage and was a fault or error in the management of the vessel, the owner was not exempted from liability by Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946).

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 138.*]

Appeal from the District Court of the United States for the Eastern District of Michigan; Alexis C. Angel, Judge.

Suit by the Cleveland Grain Company against the steamer R. P. Fitzgerald, George B. Taylor, claimant. Decree for respondent, and libelant appeals. Reversed.

Warren, Cady & Ladd and S. A. Hill, all of Detroit, Mich. (Lewis, Adler & Laws, of Philadelphia, Pa., of counsel), for appellant.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

HOLLISTER, District Judge. The Cleveland Grain Company filed a libel against the steamer R. P. Fitzgerald and George B. Taylor, claimant and owner of the vessel, seeking to recover for an injury to a cargo of wheat shipped from Duluth to Cleveland on a voyage ending October 31, 1909. The wheat (84,500 bushels) was in good order and condition when shipped, and the bill of lading provided that it was to be delivered at Cleveland in like good order and condition to the libelant, the consignee of the shipper.

Early in the morning of November 1, 1909, the process of unloading at an elevator in Cleveland began, and early in the afternoon it was discovered that a portion of the cargo was injured by coal oil. Upon examination it appeared that coal oil was leaking from a hole in the floor of the steamer's lamp room, situated on deck about amidships and immediately over the cargo. The room was 10 feet by 5 feet, sheathed on the inside with zinc. The metal sheets on the wooden floor were soldered at the seams and up the sides for a distance of six or eight inches, making the floor, were it not for the hole hereinafter referred to, liquid tight.

In one corner of the room, projecting three or four inches above the floor, was a rack upon which rested a 60-gallon tin oil can. At the far corner, on the same side and coming through the floor, was an exhaust pipe for the steam heater which had a nipple and washers above and below the deck, thus making the hole through which the pipe came liquid tight.

Within three inches of it was another pipe put in for the purpose of introducing live steam in case of fire. For the introduction of this pipe a hole had been cut through the floor, and there was an unguarded aperture of from three-eighths to one-half an inch between the pipe and the circumference of the hole. This pipe had been introduced many years before as a protection against fire, to comply with a law of the United States in that behalf. The floor sloped slightly in all directions toward this corner, so that all liquid on the floor would naturally flow toward the hole and drop upon the cargo. The vessel was about 25 years old.

In the morning of November 1st, while the unloading was going on, a seaman was instructed to clean the oil tank. It contained about five gallons of oil, which he withdrew from the tank, and, after the cleaning, poured back into the tank. Upon investigation it appeared that the soldering of the seam between two tin plates at the bottom of the tank was no longer effective for its purpose for a distance of about four inches or less. The tank in other respects was apparently in good condition. Several gallons had leaked out of the tank and had run across the floor to the hole in the corner and down upon, and into, the wheat, damaging 8,904 bushels, to the agreed amount of $4,218.57. There was some other loss caused by water, which, with expenses connected therewith, was paid by respondent. This and the matters involved in respondent's cross-libel are not now in controversy.

The libelant claims the ship was unseaworthy when it left Duluth, in that the oil tank was worn out through years of service and its material had broken down at its final cleaning which was done in the

usual manner; and in that the lamp room was unseaworthy because of the hole in the floor which permitted the damage to be done.

There was some evidence tending to show that the seam at the bottom of the tank had been injured by some iron implement, the claim being made by the claimant that the seaman who did the cleaning used an iron scraper which in its action disturbed the seam and the solder which made the seam oil tight.

As to the second claim of unseaworthiness, it was the claimant's contention that its construction was in common practice in wooden vessels upon the lakes and had been for many years; that inspectors and surveyors, government and insurance, had for many years inspected and passed this vessel; and that, although by reason of this occurrence wooden vessels were thereafter required to have pipes of that kind in such a location protected in such a way that water would not escape through the orifice in the floor made by the pipe, yet this was not evidence of any want of seaworthiness or of care, but merely an advance in the art of ship construction as experience from time to time suggested.

The District Court held that the injury to the tank was caused by the carelessness or excess of zeal of the seaman in scraping its bottom, and hence the carrier was not responsible for the damage which resulted from "faults or errors  *  *  *  in the management" of the vessel, under the provisions of the third section of the Harter Act (Act of February 13, 1893, c. 105, 27 Stat. 445, U. S. Comp. St. 1901, p. 2946);[1] and that the hole in the floor was not a condition of unseaworthiness existing at the time the vessel left Duluth, because the leaking of oil at such a place from such a can and with such consequences was not a result ordinarily to be anticipated; and that, since such construction was, and had been for many years, common practice in wooden vessels engaged in transporting grain on the Great Lakes, the question of unseaworthiness was to be determined with reference to the customs, practices, and usages of the ports from and to which the vessel had sailed.

Whether or not we would have found the condition of the oil can due to carelessness in cleaning it (if that is the true explanation of the leak) is not material now. Assuming the carelessness of the seaman

[1] "Be it enacted, etc., That it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

"Sec. 2. That it shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence, properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the

as established, and that it was a fault or error in management of the vessel of such kind as to exempt the shipowner from responsibility for its condition, as counsel on both sides of the case agree it was, yet the question remains whether or not, under the facts in this case and the law applicable thereto, the shipowner is relieved under section 3 of the act from responsibility from the damage to this cargo.

[1] The contention of the claimant that carelessness in cleaning the can was the proximate cause of the damage, and that, being excused by the third section of the act from its results as a fault or error in management, the libelant cannot recover, has no sanction in the law. This is clearly shown by Judge Addison Brown, in The Manitoba (D. C.) 104 Fed. 145, 155, 156. It will be seen that the question is not one of relative operating causes, proximate or remote. It has to do with the circumstances under which the owner of a vessel is relieved by the operation of the act from consequences for which he would have been responsible prior to its enactment, and involves his responsibility for the condition of his vessel at the inception of the voyage to carry the cargo which he has contracted to transport.

Having in mind the terms of the bill of lading (which make the contract, Justice Gray, in The Caledonia [C. C.] 43 Fed. 681, 685) that the wheat was to be delivered in the same good order and condition as shipped, no pertinent exception or exemption from liability appearing, little doubt can be entertained that under the law as it existed prior to the act there would be a warranty of seaworthiness. The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 130, 15 Sup. Ct. 537, 39 L. Ed. 644; The Irrawaddy, 171 U. S. 187, 190, 18 Sup. Ct. 831, 43 L. Ed. 130; The Southwark, 191 U. S. 1, 6, 24 Sup. Ct. 1, 48 L. Ed. 65; 3 Kent's Com. (13th Ed.) 205.

But the Supreme Court in recent cases in which the shipowner sought to escape liability for the condition of his vessel at the beginning of the voyage, by claiming exemption for faults or errors in the management of the vessel under section 3 of the act, have in positive terms established the rule that the exemptions under this section cannot be availed of by the owner unless he shows his vessel to have been

master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided.

"Sec. 3. That if the owner of any vessel transporting merchandise of property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

seaworthy at the inception of the voyage or that he had used due diligence to make her so. ·

In Int. Nav. Co. v. Farr, etc., Co., 181 U. S. 218, at page 225, 21 Sup. Ct. 591, at page 593 (45 L. Ed. 830), Chief Justice Fuller reaffirmed what he stated to be the general rule that:

"Seaworthiness at the commencement of the voyage is a condition precedent, and that fault in management is no defense when there is lack of due diligence before the vessel breaks ground."

And says (181 U. S. 226, 21 Sup. Ct. 594, 45 L. Ed. 830):

"We repeat that, even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions."

Justice Day takes up the question in The Southwark, 191 U. S. 1, at pages 7, 8, 24 Sup. Ct. 1, 2, 3 (48 L. Ed. 65), and, after referring to the absolute quality of the shipowner's warranty prior to the passage of the act, says:

"Section 3 must be read with section 2 to effectuate the purpose of the act, and shows an intention upon the part of Congress to relax in certain respects the harshness of the previous rules of obligation upon shipowners, provided the owner shall exercise due diligence to make the vessel seaworthy in all respects, in which event neither the vessel nor the owner shall be liable, among other things, for faults of management or for loss from inherent defect, quality or vice of the thing carried. * * * Since the passage of the act, as to cases coming within its terms, before the owner can have the benefit of the relief provided by section 3 he must have exercised due diligence to provide a seaworthy vessel capable of performing her intended voyage."

The same learned justice, speaking for the court in The Wildcroft, 201 U. S. 378, at page 388, 26 Sup. Ct. 467, at page 468 (50 L. Ed. 794), says, with reference to the facts in that case:

"* * * There could be no question as to the liability of the vessel owner from the established facts of the case, but for the immunity afforded by that act. To permit a cargo of sugar to be injured by the introduction of fresh water in the manner shown, but for the provisions of this act, would have made a case of clear liability against the owner, and where the statute has given immunity against such loss by reason of error in navigation or management, it does so upon the distinct condition that the owner shall show that the vessel was in all respects seaworthy and properly manned, equipped, and supplied for the voyage; or, if this cannot be established, that he has used due diligence to obtain this end. This discharge of this duty is not left to any presumption in the absence of proof. It is the condition precedent, compliance with which is required of the vessel owner in order to give him the benefit of the immunity afforded by the act."

[2] The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. So Justice Gray says in The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241, and it is said to be the commonly accepted test. Justice Day in The Southwark, 191 U. S. 1, 9, 24 Sup. Ct. 1, 48 L. Ed. 65.

Whether or not the vessel is reasonably fit to carry her cargo must be determined upon all the circumstances and evidence in the case. Int. Nav. Co. v. Farr, etc., Co., 181 U. S. 218, 224, 21 Sup. Ct. 591, 45 L. Ed. 830.

In exercising the degree of care imposed upon the owner by the law (The Irrawaddy, 171 U. S. 187, 192, 18 Sup. Ct. 831, 43 L. Ed. 130; The Tenedos [D. C.] 137 Fed. 443, 445), he will be required to take such precautions as are reasonably adequate for the protection of the cargo against known perils, or which reasonable foresight may have anticipated (The Jean Bart [D. C.] 197 Fed. 1002, 1003, 1004).

[3] Having in mind the lamp room and its location, the wheat in bulk below, the fact that the floor was originally made liquid tight, its slope toward the hole in the corner, the location and capacity of the oil tank, its frequent daily use, the possibility of its leaking and of negligence or accident in handling it for frequent use, the character of the cargo and its susceptibility to injury by a small amount of oil, or even the odor of oil, did the owner provide a seaworthy vessel or use due diligence in endeavoring to do so?

The respondent claims that he did. He has the burden of showing it. To the cases already cited dealing with that subject may be added The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Rappahannock, 184 Fed. 291, 107 C. C. A. 74 (C. C. A. 2d Cir.); and there are many others. To carry this burden, he shows that the method of carrying pipes of this kind through the floor after the law required their installation was common for many years in wooden vessels on the Great Lakes; that the primary purpose of surrounding the live steam pipe with a nipple and packing, making liquid tight the aperture through which it came, was to prevent the charring or deterioration of the surrounding wood caused by the at times superheated pipe (though another purpose was to prevent the flow into the hold below of any liquids that might be spilled); that this boat, and others with similar construction, had been inspected and passed by various inspectors and surveyors representing associations of vessel and of cargo insurance underwriters, and classified with a high rating (though not the highest) with respect to adequacy for insurance purposes, and by United States local inspectors of steam vessels and by inspectors under a Minnesota statute requiring vessels, into which grain is about to be loaded, to be made clean and in proper condition to receive the same, with particular attention to vessels that have been used for transportation of coal, oil, lime, stock, etc., and on no account suffering grain to be loaded into a vessel if there is danger of its becoming damaged by reason of the character of previous cargoes.

He cites The Blue Jacket, 10 Ben. 248, Fed. Cas. No. 1,569, and The Amelie, 6 Wall. 18, 27 (18 L. Ed. 806) that:

"The advice of a fair, competent and disinterested survey is always considered to be strong evidence in justification of a course adopted by the master of a ship in a port of distress."

And he argues that the requirement, following this occurrence, that all such orifices be made liquid tight, does not reflect adversely upon the contrary practice theretofore prevailing, but is merely the result of experience teaching a better way, since progress is always making through the teachings of that hard taskmaster. And he cites The Nevada, 106 U. S. 154, 157, 1 Sup. Ct. 234, 27 L. Ed. 149, to the point

that "the event is always a great teacher," and that possibilities are not the criteria when the question of reasonable prudence is at issue.

Giving due weight to these facts and arguments, we are nevertheless not persuaded by them.

Counsel admit that negligence in handling an oil tank from which oil might escape to the damage of a cargo would be "an error or fault in management," and upon this counsel for the respondent base the exemption of liability of the owner in this case, and acknowledge the same measure of obligation as to internal dangers, such as the admitted fault or error in management, as is borne by shipowners with respect to ordinary perils of the sea, the one being internal and the other external, but to be dealt with under the same rules.

No doubt if the deck of a vessel were improperly calked and water from cleaning the deck, or from careless handling, or from the ordinary perils of the sea, had leaked through to the damage of a load of wheat immediately below, there would be a condition of unseaworthiness. The Ninfa (D. C.) 156 Fed. 512. Kelley, the master of the ship, and Nacey, the respondent's surveyor, agree that openings in the deck must be made absolutely tight to the sea. Why should not failure to properly make the floor of the lamp room oil tight, a cargo of wheat immediately below it, be declared to be a condition of unseaworthiness? Why was it that the metal covering of the floor was soldered and the sheathing on the walls not soldered? Why was the soldering carried up a number of inches from the level of the floor? While it might be admitted that sheathing the room generally with zinc (it being an oil room) was primarily a protection against fire, yet that protection did not need the soldering of the joints of the metal on the floor, or the extension of the metal so soldered any distance up the sides of the room.

This consideration is proof enough of the anticipation that oil might leak upon the floor, and, if it did, that it would otherwise trickle down through the wooden joints of the flooring into the cargo.

This vessel's business was largely in carrying grain, an article peculiarly susceptible to the destructive contact of oil—and, indeed, to the odor of oil. The mere odor of petroleum is a fact to be borne in mind by the owner of a vessel when the cargo is susceptible to injury from contact with it (The Lizzie W. Virden [C. C.] 8 Fed. 624); so, also, the effect upon a cargo of the fumes of creosote (Church Cooperage Co. v. Pinkney, 170 Fed. 266, 95 C. C. A. 462).

Not only was this room in daily frequent use in taking oil out of the large tank, but there is abundant evidence, from respondent's witnesses, as well as others, that the leaking of oil cans is by no means an uncommon occurrence on shipboard. One cannot but wonder why it is that when such care was exercised for several inches up the sides, so as to prevent the escape of oil from the floor to the hold, so little care was exercised, after the hole was punched through the floor for the purpose of introducing the fire extinguisher pipe, in leaving an aperture of quite an appreciable size in the floor through which the oil would run, thus bringing to naught the laudable purpose of the original construction. This thought is emphasized by the fact that the other

pipe, three inches away, was so protected that it not only served its primary purpose, but also prevented the flow of liquid through the hole into the hold from which it came.

The third section of the Harter Act is 'an act of grace, giving the owner exemption from acts of carelessness in management, such as improper cleaning of the oil can, if only he shows his vessel to have been seaworthy at the inception of the voyage, and excuses him from liability to which he otherwise would be subjected for such negligence, if, in spite of the negligence and notwithstanding the injury resulting therefrom, his vessel is seaworthy as against such acts, or he has used reasonable diligence to make it so.

The owner is not responsible for internal dangers such as the negligent handling of the oil can, but he is responsible for not providing, at the beginning of the voyage, a ship adequate to meet them. The rule is not, as claimed by counsel for respondent, that the owner is not bound to anticipate that his servants in handling oil will be careless, or that the oil may leak from a defective can; but his foresight must be so comprehensive as to provide at the beginning of the voyage a ship seaworthy as against the consequences of negligence, accident, or leakage, or other errors or faults in management reasonably to be anticipated. He ought to foresee that oil, escaping, whether through negligence or accident or leakage, will flow like water, and is even more searching in its permeations, as the evidence shows, than water; and that, if it did escape, the result must be damage to the cargo, if there is a hole in the floor to let the oil through upon it. That in fact he did foresee this is shown by the construction of the floor expressly made otherwise liquid tight.

Since the leaking oil would, in the natural course of events, flow through the hole in the floor and fall directly upon the wheat, it can be said with considerable certainty that the vessel was not in a reasonably fit condition to safely transport its cargo. A vessel, says Judge Addison Brown, in The British King (D. C.) 89 Fed. 872, 874—

"though seaworthy as respects navigation, may be unseaworthy as respects cargo; since the direct natural consequence of the leak in that case is to damage the cargo; and the ship, therefore, is not in a reasonably fit condition for its transportation."

It will not do to say that the required measure of anticipation of future occurrences is met because inspectors have found no fault with the construction. Indeed, the supervising master of the respondent's line of steamers stated emphatically that, even when a classification had been given a vessel, there was still a responsibility upon the owner for adequately fitting out the vessel, and that the classification would not relieve the owner from such responsibility. The fact of the vessel's having obtained a surveyor's certificate was not regarded as of great importance. The Abbazia (D. C.) 127 Fed. 495, 496, in which Judge Adams says:

"The diligence required * * * is diligence with respect to the vessel, not in obtaining certificates."

And so in a number of cases it appears that vessels which surveyors had passed, or which had received a high rating, were nevertheless found unseaworthy. The Folmina, 212 U. S. 354, 360, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Rappahannock, 184 Fed. 291, 292, 107 C. C. A. 74; The Ninfa (D. C.) 156 Fed. 512, 525; The Presque Isle (D. C.) 140 Fed. 202; The Brilliant (D. C.) 138 Fed. 743, 749, affirmed 159 Fed. 1022, 86 C. C. A. 671.

While, no doubt, if the owner had taken advice of competent, disinterested persons and had acted accordingly, that might be strong evidence in justification of his course; yet in this case the approval of the surveyors and inspectors was only of a negative character. They might, or might not, have examined the oil room, and, if they did, being human, they are by no means exempt from the common human frailty of negligence.

"It is quite true," says Justice Holmes, in The Germanic, 196 U. S. 589, 595, 596, 25 Sup. Ct. 317, 318 (49 L. Ed. 610), "that negligence must be determined upon the facts as they appeared at the time and not by a judgment from actual consequences which then were not to be apprehended by a prudent and competent man. * * * But it is a mistake to say, as the petitioner does, that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent. The standard of conduct * * * is an external standard, and takes no account of the personal equation of the man concerned."

And surely it can be no defense, if true in fact, that other owners of wooden vessels were also wanting in properly protecting similar holes in the floors of their lamp rooms. It is said in The Tenedos (D. C.) 137 Fed. 443, 446, 447, affirmed 151 Fed. 1022, 82 C. C. A. 671:

"But the fact that shipowners are not in the habit of using precautions which would demonstrate unseaworthiness is immaterial. They are bound to use them"—citing The Edwin I. Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 823, 38 L. Ed. 688.

The conclusion cannot be escaped that the respondent neither provided a seaworthy vessel nor used due diligence to make her so.

Even if there were doubt about it, the owner could not escape liability; for, as said by Justice Day in The Wildcroft, 201 U. S. 378, 389, 26 Sup. Ct. 467, 469 (50 L. Ed. 794), if "the question of the ship's seaworthiness was left in doubt, that doubt must be resolved in favor of the shipper, because the vessel owner had not sustained the burden cast upon him by the law to establish that he had used due diligence to furnish a seaworthy vessel."

See, also, The Edwin I. Morrison, 153 U. S. 199, 212, 14 Sup. Ct. 823, 38 L. Ed. 688.

We are of opinion that the respondent is liable for the injury to the libelant's wheat, and libelant is entitled to a decree for $4,218.57 (the amount of damage not being disputed), interest and costs here and in the court below.

Since the rate of interest in Ohio in cases in which interest may be recovered is 6 per cent. (General Code of Ohio, § 8305), interest from November 1, 1909, the date of loss, will be computed at that rate in accordance with the decision of this court handed down January 6,

1914, in the case of Cambria Steamship Co. v. Pittsburgh Steamship Co. (No. 2386) 212 Fed. 674, 129 C. C. A. 210, for the reasons there given by Judge Warrington, fixing the interest in that case at 5 per cent., the statutory rate in Michigan.

The judgment below is reversed, and the case is remanded to the District Court for further proceedings in accordance with this opinion.