## THE OAKLEY C. CURTIS.

(District Court, S. D. New York. October 27, 1922.)

1. Shipping ⬤⟿42—Obligation of owner to furnish seaworthy ship.

Harter Act, § 3 (Comp. St. § 8031), does not exempt owner of a chartered vessel from the obligation to furnish a vessel which is seaworthy and fit for the cargo to be carried at the commencement of the voyage.

2. Shipping ⬤⟿42—Grain-carrying vessel must be fitted with proper dunnage.

A chartered vessel carrying grain, beginning her voyage at a time of year when storms at sea are prevalent, must install dunnage to keep the cargo free from water which may reasonably be expected to enter during the voyage from strains and stress of weather or other leakages.

3. Shipping ⬤⟿42—Damage to cargo of flaxseed held due to improper dunnage, which rendered the ship unseaworthy.

Damage to a cargo of flaxseed in chartered vessel from seawater on a voyage from Buenos Aires to New York held due to unseaworthiness of the ship, in that, being a wooden vessel, unused to carrying grain cargoes, she was not properly dunnaged to protect the cargo; it not appearing that she encountered more severe weather than was to be expected at the season.

In Admiralty. Suit by the Midland Linseed Products Company against the schooner Oakley C. Curtis and the France & Canada Steamship Corporation. Decree for libelant.

Everett, Clarke & Benedict, of New York City, for libelant.

Patterson, Eagle, Greenough & Day, of New York City, for respondents.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HAZEL, District Judge.    This is a libel to recover $146,000 damages to a cargo of linseed transported in the five-masted schooner Oakley C. Curtis from Buenos Aires, Argentina, to New York, and chartered by libelant expressly for the voyage.    There were transported 47,414 bags of linseed, which required the entire cargo space, and on arrival of the schooner in New York at her place of unloading it was discovered that nearly half her cargo, about 40,460 bushels of linseed, was damaged by seawater, and there was also, it is claimed, a shortage of 1,315 bags.    The vessel left Buenos Aires on April 13, 1918, and arrived in New York in the middle of June following.

Libelant contends that the entire damage was sustained because of the unfitness and unseaworthiness of the vessel in relation to her dunnage, while the respondents claim in opposition that the vessel was wholly seaworthy at the beginning of the voyage, and the damage sustained was due to a severe storm, which caused the vessel to leak, and not because of any negligence on her part or on the part of her owner.

[1] The first question is: By what rule of law is the controversy governed?    The charter party, inter alia, provides that the vessel shall be staunch and strong and in every way fit for the trip and for carrying the merchandise in question; also that the linseed shall be shipped in bags, but that respondents shall not be accountable for torn or stained bags or for loose linseed.    It is contended that under the Harter Act (Comp. St. §§ 8029–8035) the respondents warranted the seaworthiness of the ship in so far only as ordinary care can provide, and that the vessel was relieved only from liability arising (sections 3–7, Harter Act) from the act of God, perils of the sea, etc., as provided by section 3 of the charter party.    But to so extend the Harter Act, as hereinafter pointed out, would not be warranted.    The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181.    Although the vessel was not in a strict sense a common carrier, she having been chartered for a particular voyage only, it nevertheless was required that she should be fitted out properly and properly dunnaged for conveying the linseed without injury through stress of weather such as might reasonably be expected during the journey to prevent moisture and leakages en route, and prevent any appreciable part of the cargo sifting down into the bilges, where it might result in clogging or retarding the operation of the pumps, if their use was required.

It is not claimed that the hull of the vessel was unseaworthy, or that she was improperly manned or equipped.    Indeed, the vessel was classed A–1 by the American Bureau of Shipping prior to her departure from New York to Buenos Aires, where her dunnage was placed to prepare her for the shipment.    The asserted negligence is: (1) That she was not reasonably fit to carry the linseed, in that her dunnage was improper and insufficient; (2) that the partition around the pump house was defective, and allowed water in rough weather to flow to the cargo between-decks; (3) that a hole in the floor of the galley permitted water to flow onto the cargo; (4) that the wastepipe under the captain's cabin was cracked, and leaked water onto the cargo.    The respondents were not relieved from liability upon the exercise of due diligence to make the ship seaworthy, for the duty of providing a seaworthy vessel

to receive the particular cargo at the inception of the voyage rested upon them. The Carib Prince, supra; Int. Nav. Co. v. Farr, 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830; The C. W. Elphicke, 122 Fed. 439, 58 C. C. A. 421; The Viking (C. C. A.) 271 Fed. 801; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65.

[2] It is considered well established that a vessel beginning her voyage in a time of year when storms at sea are prevalent, carrying grain, must install dunnage, so as to keep the cargo free from water which may reasonably be expected to appear during the voyage, either from strains and stress of weather or from other leakages. The Wm. Power (D. C.) 131 Fed. 136.

[3] Assuming the facts as testified by libelant's witnesses, the vessel was unfit at the inception of the voyage to carry the cargo in question. She was built of wood, and was unused to carrying grain, which was commonly transported from the river Plate in steel boats, that were impervious to leakage from strains or opening of seams. In steel vessels the dunnage is materially different from what is ordinarily required in a wooden vessel. Libelant's witnesses Bagger and Conner have both had a large experience as navigators, and in transporting grain from Argentina, and they testified that the wood dunnage to sufficiently protect such a cargo required sealing, boarding of the sides and flooring on scantlings, tightening of decks or stowage, covering the air strakes and spaces leading to the bilges, and tightening and caulking the partition around the pump house, and that their inspection of the vessel after her arrival in port disclosed insufficient and insecure protection to the cargo in this particular.

As to the specific requirements the testimony is not in the main contradictory; the expert witness, Santos, testifying for the respondents, substantially agreeing that the custom of the port required dunnage of the described character to properly protect the cargo. It is proven, however, that the pieces of boards used for sealing the sides of the vessel had no protecting crosspieces, as they should have had, and that the boards were spaced too far apart, with the result that many linseed bags pressed or pushed into the spaces and against the ceiling or skin of the ship. In consequence, the bags and contents in the lower hold of the ship were wetted during the heavy sea. It is also shown that the lower floor or deck was improperly supported by scantlings, which were placed too far apart, and accordingly afforded insufficient resistance, causing the floor to break and lowering the cargo to within a few inches of the bottom, where it was drenched by water coming into the vessel. The air strakes and spaces between the beams extending into the bilges were not securely covered, as they should have been, and loose grain was on account thereof enabled to sift to the bilge between the timbers of the vessel, which would clog and in fact did clog the pumps, and prevent pumping the water out of the hold, which had leaked into the vessel during the gale.

The testimony of Captains Bagger and Conner, Neubert, Terrence, and Bisbee, who saw the dunnage in the vessel on her arrival at New York, and the fair inferences drawn therefrom, outweigh in my opinion the testimony of the respondents in relation to a proper dunnage

construction. Much damage from water was caused by the linseed and lint of the bags sifting down and choking the pumps. Captain Bagger carefully examined the air strakes, found they were four inches wide, with spaces ten inches between the timbers to the bilges, and in his inspection he observed that the air strakes were filled with sifted linseed, as also the spaces between the beams. No boards, he says, were nailed over the air strakes and spaces, and should have been to fully protect the cargo. His testimony is corroborated as to this by Terrence, the head stevedore, who also inspected the dunnage during the vessel's discharge, and to some extent by Neubert, and their testimony outweighs any contrary testimony on this point.

It is next urged by libelant that the partition of the pump house was not tight, and water was allowed to leak between-deck onto the cargo stowed there, and also into No. 1 hatch, reaching the linseed in the lower hold. The pump room is shown to be located in between-deck and partitioned off from the cargo. In the operation of the pumps libelant claims water would spill out and run into No. 1 hatch, and thence to the lower deck; but the testimony on this point is considered unconvincing. The pump house was properly constructed and the partition inspected by Captain Creighton and the witness Dendel at Tietjen & Lang's dry dock before the vessel left New York for Buenos Aires. She was thoroughly examined at the dry dock inside and outside, for the purpose of making any needed repairs, and no impairment in the pump house or partition was discovered. Engineer Bates swore that the partition around the pump house was water tight and in good condition, but he does not remember whether it was caulked.

I am not impressed by the libelant's showing that the water from the pumps in large quantities seeped through the deck, but believe, on the contrary, that the wetted cargo immediately under No. 1 hatch and between-deck was due wholly, or in part, to the rough sea, and that water leaked through the butts and seams opened up on the deck by the working of the vessel during the rough weather. It is not improbable that the cargo under No. 1 hatch at the sides and near and under the pump house also was damaged because of the opening of seams at the sides of the vessel, and not wholly because of the water coming through the seams on the deck. But that is a question that may safely be left for ascertainment and determination at the accounting. As to water coming in at the sides, the respondents are deemed liable for the damage from such cause, since it is shown that, if the 'tween-deck and the lower hold had been properly sealed or dunnaged, the water would have passed into the bilges and would have been pumped out, if the pumps had not clogged.

It is not satisfactorily shown that one of the holes in the floor of the galley was improperly plugged, as contended. Captain Hutchins and the first mate of the Curtis swear positively that before the vessel left Buenos Aires both holes were inspected, and were properly and securely plugged, while the Chinese steward, whose living quarters were in the galley, swore that no water came down into the galley during the storm. It is pointed out, however, that the cargo directly under the holes was damaged by seawater; but in this relation the burden was

upon libelant to prove negligence affirmatively, and in this it has failed. The C. R. Sheffer, 249 Fed. 600, 161 C. C. A. 526. Nor is the evidence sufficient to show that the ship was unseaworthy because of any break in the wastepipe in the captain's room.

Coming again to the dunnage construction, respondents insist that it was adequate and sufficient to protect the cargo in between-decks and in the lower hold; that Santos, who prepared the dunnage, Captain Lewin, a Lloyds surveyor, who supervised its construction and certified to its sufficiency, and the witness Ford and Captain Hutchins have given evidence in substantiation thereof. Their testimony on this point, however, is not thought reliable or persuasive, and I believe that libelant's evidence preponderatingly shows that the improper dunnage was responsible for the damage of the cargo at the sides of the vessel, and, as heretofore stated in whole or in part between-decks.

The principal defense of the schooner and her owner is that on the way to New York she encountered rough weather, gales, and storms lasting three days, during which she labored, and on April 20th opened her seams and butts at the bottom and sides, between the fore and main rigging and around the hatch combings; seawater in this way entering the cargo. It is true that severe weather was encountered, and the ship tried by a southeast wind blowing a gale and heavy easterly sea, which caused her to ship much water. Her shroud from the forerigging was carried away on the second day, and when leaking began resort was had to the pumps, while on the third day of the gale the wind veered to the southward. It was even suggested that the vessel's safety at times was endangered. But the asserted severity of the weather, and that the consequent damage to the cargo was attributable to the perils of the sea, is strongly disputed. The evidence of respondents in relation thereto is not wholly in accord with the entries in the ship's log, wherein the storm is not mentioned as a severe one, or one of extraordinary proportions; the log merely mentioning the storm with southeast wind or gales.

Both Captains Conner and Bagger expressed the opinion that a strong southeasterly gale was ordinarily encountered on such a voyage in that season of the year coming from Buenos Aires, and moreover that nothing was indicated in the appearance of the vessel on her arrival to confirm extraordinary weather, or that she passed through a hurricane, or suffered undue straining—more than was to be expected on a voyage lasting 60 days. The wireless operator of the Curtis, who has sailed the seas for 4 years, was not greatly impressed by the storm's severity or any sea perils. He declared that the weather outward bound was more severe than on the vessel's return, and that the weather was "the usual average storms down around the equator." He also stated that Engineer Bates told him of the trouble with the pumps being due to linseed clogging them. In view of the conflicting evidence, I am disinclined to believe that the severity of the storm was such as to entirely exempt respondents from liability under the perils of the sea clause in the charter.

My conclusion is that the cargo would not have sustained material injury, except immediately under the deck at No. 1 hatch and in be-

tween-deck, if the dunnage had been proper and sufficient. Its use would have protected it from the water coming in at the sides of the vessel, and there would have been no water-logged condition if the pumps had functioned properly. And, moreover, it is my conclusion that, if the air strakes and spaces between the beams had been properly closed, there would have been no sifting of linseed into the bilges or choking of the pumps in efforts to discharge the water that came in through open seams at the bottom and sides of the vessel. That the vessel worked and rolled during the rough weather is quite believable, but her rolling to some extent may fairly be accounted for by her water-logged condition. Hence the respondents have not satisfactorily explained that the entire damage was within the exception of the bill of lading, and that it was not sustained because of unseaworthy condition at the beginning of the voyage. See The Aggi, 107 Fed. 300, 46 C. C. A. 276; The Rappahannock, 184 Fed. 291, 107 C. C. A. 74; The Governor Powers (D. C.) 243 Fed. 961.

A decree may be entered for libelant, with costs, and referring the ascertainment of damages to a commissioner.