## AMERICAN FINANCE & COMMERCE CO., Inc., v. UNITED STATES.

### No. 19325.

District Court, N. D. California, S. D.

Feb. 4, 1932.

726

Sawyer & Cluff, of San Francisco, Cal., for libelant.

George J. Hatfield, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal.

ST. SURE, District Judge.

Libel in personam for damage to cargo by the American Finance & Commerce Company, Inc., a corporation, against the United States of America, under an act authorizing such suits in admiralty, etc. (sections 741–752 inclusive, title 46, USCA). Respondent at the time of alleged damage owned and operated, by and through the United States Shipping Board, the steamer West Faralon. The libel contains three separate causes of action for damage to as many lots of Chinese shelled peanuts of the crop of 1926, shipped under separate bills of lading to San Francisco on the West Faralon from Tsingtao, China. The peanuts were shipped in 100-pound bags.

It is alleged that "the said steamer failed and neglected to deliver the said peanuts in like good order and condition as when shipped, but delivered the same in a badly damaged condition, that is to say, the said peanuts were badly molded, stained, sweated, decayed, and otherwise seriously damaged."

While denying negligence in its answer, and offering evidence to support such allegations at the trial, upon submission of the cause it appears that the respondent, for a defense, mainly relies upon libelant's failure to prove good order and condition of the peanuts upon shipment, and the provision of the law limiting liability for "the inherent defect, quality, or vice of the thing carried" found in section 192, title 46, USCA, and incorporated in each bill of lading.

The peanuts may be described as one lot of 1,150 bags, one lot of 4,000 bags, and one lot of 1,500 bags. They were stowed in a lower hold of the ship, one lot on top of the other. Libelant offered no proof of the good order and condition of 1,150 bags, alleged damage to which was the basis for the first cause of action, and the same has been abandoned. It will be necessary, however, occasionally to refer to this first lot in discussing the evidence.

As to the contents of the bags on arrival in San Francisco, it is undisputed that some in each lot were in such moldy condition as to be seriously damaged; that some were in slightly damaged condition, sound and moldy peanuts being found in the same bag; and that some were in sound condition, as to which there is no claim. As to the bags themselves, libelant's witness testified that the outside of the bags were in "general good condition," "very few of them showed any stains of any kind;" and respondent's witness testified that the exterior of the bags showed no mold or dampness.

Libelant's surveyor, Captain Dobson, testified as to the actual condition of the peanuts at the time of discharge. The witness's testimony may be summarized in part as follows:

| | | |
|---|---|---|
| Top—1150 bag lot | 625 good condition | 54.3% |
| | 432 slightly damaged | 37.5% |
| | 90 badly damaged | 07.8% |
| Middle—4000 bag lot | 3584 good condition | 89.6% |
| | 198 slightly damaged | 04.9% |
| | 218 badly damaged | 05.4% |
| Bottom—1500 bag lot | 548 good condition | 36.5% |
| | 753 slightly damaged | 50.2% |
| | 194 badly damaged | 12.9% |

Captain Dobson testified as to the slightly damaged bags that he found mold "sometimes in one part of the bag and sometimes in another. It might be at one end of the bag * * * or the side or the middle." Some of the bags were moldy throughout.

Respondent's witness, Mr. Juergens, also testified that in the slightly damaged bags the mold was scattered. He was present when a portion of the bags were inspected. The contents of some were sound, and some were slightly molded. "In other bags they would find the bulk of the mold in the center of the bag with good peanuts in both ends."

The "slightly" damaged bags were more than two and one-half times as numerous as the "seriously" damaged (1,383 against 502) in three lots. The presence of good alongside of moldy peanuts in the same bag is characteristic of a greater number of bags than is the presence of mold throughout.

The question naturally presents itself: What caused the mold in this cargo, and who is to blame for it?

It is recognized that peanuts are a perishable commodity. Witnesses on both sides are agreed that an unusual situation prevailed with reference to the crop of 1926. For some reason, peanuts grown that year contained an excessive amount of moisture, and, as a consequence, many shipments arrived at San Francisco in a moldy condition.

Libelant charges that the ship was unseaworthy. It is claimed that there was mold on straw mats used for dunnage; that the hold of the ship was damp from having been whitewashed only the night before the peanuts were loaded; and that there was not sufficient or adequate ventilation.

■ There is testimony supporting libelant's contentions as to the dunnage and the whitewashing, and these, in conjunction with inadequate ventilation, probably contributed to the damage. Respondent admits that the ventilation was insufficient, which leads libelant to say that "the case is at an end * * * in the face of respondent's admission of unseaworthiness." With this I cannot agree, in view of the holding of the Supreme Court in the case of The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 517, 72 L. Ed. 901, where it is said that "unseaworthiness alone * * * displaces the contract of affreightment only in so far as damage is caused by the unseaworthiness."

See, also, Hartford & New York Transp. Co. v. Rogers & Hubbard Co., etc. (C. C. A.) 47 F.(2d) 189; The Suduffco (D. C.) 33 F.(2d) 775.

■ Furthermore, the burden was upon libelant to prove the good order and condition of the peanuts when shipped. The bills of lading recite the shipment of the peanuts in "apparent good order and condition," "quality, quantity, gauge, weight, measurement, contents, and value unknown," to be delivered at San Francisco "in like good order and condition." Such recitals only dispense with evidence that the cargo, so far as external appearance went, was in good order and condition, and it was incumbent upon libelant to prove the good order and condition of the shipments at the time they were made. See The Dondo (D. C.) 287 F. 239; The Solveig (D. C.) 217 F. 805; The Lyra (D. C.) 231 F. 250; The Muskegon (D. C.) 10 F.(2d) 817; Monnier v. United States (D. C.) 16 F.(2d) 812; Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985.

Libelant's witness, Mr. Eckford, testified with reference to the examination before shipment of the two lots for which damage is asked. In making his inspection and survey, he opened 14 bags out of the 1,500 bag lot, and 25 bags out of the 4,000 bag lot; one sample taken from each bag being "about two grab-handfuls." He made tests for count and weight, but no boiling test, and apparently his examination of the sample was purely visual of the exterior of the nut.

Respondent's witness Wilson testified that opening 14 bags out of 1,500, and 25 out of 4,000, was not a fair test of either shipment; that opening 5 per cent of the shipment was the customary sampling in the Orient, and 10 per cent. in San Francisco; that this custom of the trade would have required Mr. Eckford to open 75 bags out of the 1,500 bag lot, instead of 14, and 200 bags out of the 4,000 bag lot, instead of 25, if he followed the Oriental custom, and 150 and 400 bags if he followed the custom of the San Francisco trade for which the peanuts were intended; that the "grab-handful" method of getting the sample was improper; that the proper method is to open the bag, dump the contents, inspect the entire contents, and then get the sample from the contents as a whole.

Mr. Wilson's testimony in this regard was corroborated by other witnesses. It is doubtful if the test made by Mr. Eckford was fair.

■ This brings us to the question as to the inherent vice of the cargo.

We have seen that peanuts are a perishable commodity; that the crop of 1926 contained an excessive moisture content, which is hazardous to shipping. Respondent's witness, Mr. Wilson, testified that "The crop of 1926 did not compare favorably with previous crops, or crops after 1926;" that upon examination of shipments on discharge "possibly the upper part of the bag would be excellent as to quality, but when we went into the center of the bag you would find that the peanuts had been moldy, rancid, and mildewed;" that the mold was scattered through the bag.

Upon request of the court, without objection, Mr. Wilson searched his office records and reported to the court as follows: "Our records disclose of the 1926 crop of shelled peanuts our total importations at the port of San Francisco equalled 27,925 bags, and which would equal approximately 1400 tons of 2000 lbs., and of this tonnage our records further disclose that with the exception of 2800 bags, or 140 tons, all of the shipments arrived in a more or less moldy condition. We might add that our records further disclose that due to the peanuts arriving in this unsatisfactory condition, we were successful in arranging cancellations with our suppliers in China on approximately 500 tons, or 10,000 bags."

Libelant's witness, Mr. McElligott, admitted that the 1926 crop was not up to standard. Mr. Seale, a witness for respondent,

considered the 1926 crop of Chinese peanuts "the worst he ever experienced;" nothing like it before or since. The witness said it made no difference what vessel the cargo was shipped in, or how it was stowed, the peanuts always seemed to be damaged.

The evidence shows without contradiction that there was "inherent defect, quality or vice of the thing carried," and I think that such inherent vice was, in part, the cause of the damage.

I am of the opinion that the damage to the cargo is attributable partly to the fault of the carrier and partly to the fault of the shipper and the inherent vice of the cargo. It is impossible for me to ascertain for what proportion each is responsible, and I therefore conclude that the loss should be equally divided between libelant and respondent. See The Musselcrag (D. C.) 125 F. 786; Stillwell v. The J. D. Hall (D. C.) 34 F. 904.

The case will be referred to the Commissioner to ascertain and report the amount of the damage, in accordance with this opinion.