## THE GEORGIAN et al.
### No. 3459–J.

District Court, S. D. Florida, Jacksonville Division.

Sept. 23, 1933.

McKay, Withers & Ramsey, of Tampa, Fla., and Bedell & Bedell, of Jacksonville, Fla., for libelant.

Macfarlane, Pettingill, Macfarlane & Fowler, of Tampa, Fla., and Tompkins, Boal & Tompkins, of New York City, for respondents.

STRUM, District Judge.

This is a libel to recover for damage to a refrigerated cargo of citrus fruit loaded on board the steamship Georgian at Tampa, Fla., March 16, 1929, and transported by said vessel via Jacksonville and other South Atlantic ports to London, England, where it was unloaded on April 16, 1929.

The pertinent provisions of the bill of lading are:

That the fruit was received on board the vessel "in apparent good order and condition."

That the vessel shall not be liable "for loss or damage occasioned by causes beyond their control; by the act of God; by the perils of the sea; * * * or unseaworthiness of the vessel even existing at the time of shipment or sailing of the voyage, provided the owners have exercised due diligence to make the vessel seaworthy; nor for heating, frost, decay, putrefaction, rust, sweat; vermin, change of character * * * or any loss or damage arising from the inherent vice, defect or nature of the goods, or insufficiency of packages."

"Notice of loss, damage, or delay must be given in writing to the vessel's agent within thirty days after the removal of the goods from custody of the vessel * * *. Written claims for loss, damage, or delay must be filed with the vessel's agent within six months after giving such written notice. Unless notice is given and claim filed as above provided, neither the vessel, her owner or agent shall be liable."

"The goods or articles carried in any refrigerator chambers are at the sole risk of the owner thereof, and subject to all conditions, exceptions and limitations as to carrier's liability and other provisions of this bill of lading; and, further, the carrier shall not be liable for any loss for damage occasioned by the temperature, risks of refrigeration, accidents, or explosion, breakage, derangement or failure of any refrigerator plant or part thereof unless shown to have been caused by negligence of the carrier, from liability from which the carrier is not exempt under the provisions of the Harter Act. * * * *."

The ship was not chartered, but was carrying general cargo for hire and was, therefore, a common carrier subject to the provisions of the Harter Act (46 USCA §§ 190–195).

Libelant asserts that it was agreed that the fruit should be carried at a temperature of not less than 34 degrees, and not more than 38 degrees, Fahrenheit; but that contrary to such agreement the temperature was negligently permitted to fluctuate above and below those limits, damaging the fruit by frosting, overheating, and by "drip" from overhead refrigerating coils due to condensation when the temperature rose too high to hold the "snow" or "frost" on the refrigerating pipes; also, that sea water was negligently permitted to enter the holds, especially No. 4, damaging the packing cases therein.

Respondents deny these charges and claim that the preshipment cleaning treatment to which the fruit was subjected bruised, punctured, and otherwise injured the fruit, causing softening and decay, and that deterioration of the fruit was due, not to negligent refrigeration, but to "decay, inherent vice, defect or nature of the cargo," for which respondents are not liable under the terms of the bill of lading; and that the damage caused by sea water resulted from a peril of the sea, which is also excepted by the bill of lading.

Respondents also claim that notice of damage was not given in writing to the vessel's agent within thirty days after removal of the goods, which is made a condition precedent to liability by clause No. 11 of the bill of lading.

At the time in question, about 98 per cent. of all Florida fruit was cleaned for marketing by a "wet-wash" process, by which the fruit is first washed in water and then passed through a soaping tank containing slightly warmed water and a solution of borax, after which it was subjected to a paraffin vapor.

Most of the fruit here involved was cleaned by a dry-cleaning device then in use at the Tampa Terminal Company. This device consisted of a large hollow cylinder about thirty feet long and three feet in diameter, lined inside with brushes and containing a quantity of sawdust. The cylinder was inclined at an angle of about forty-five degrees, the fruit entering at the high end, and as the cylinder revolved the fruit passed through it and out at the lower end; the rust and dirt on the fruit being cleaned off in the passage through the cylinder by rotary contact with the brushes and sawdust. Respondents claim, but libelant's witnesses deny, that this process bruised the fruit, and that the stems of the fruit punctured other fruit passing through, thus causing the fruit to become soft and inherently susceptible to quick decay, notwithstanding proper refrigeration. The libelant discarded this dry-cleaning device as unsatisfactory soon after the shipment in question was made. Respondents assert that this was done because the process injured the fruit, while libelant's witnesses testify that the machine was discarded simply because it did not clean the fruit satisfactorily.

When unloaded in London and subjected to normal temperatures, the fruit quickly broke down and became soggy and inferior.

All of it was in a state of "full maturity." Some of it showed stem-end decay; some of it was withered and pitted. Many of the cases coming from No. 4 hold were stained by sea water.

There is convincing evidence both of injurious preshipment treatment and of negligent refrigeration during the voyage, though the evidence is replete with perplexing conflicts upon almost every material question of fact. As between the two theories as to the cause of the damage, the evidence is nicely balanced.

In support of respondents' contention of injurious preshipment treatment, the evidence establishes that the dry-cleaning machine above described was installed "on trial" in libelant's packing house during the fall of 1928. This machine was discarded as unsatisfactory a few days after the fruit in question was loaded on the steamer and the wet-wash process installed in its place. There is evidence on behalf of libelant that the machine was discarded simply because it did not clean the fruit satisfactorily, not because it damaged the fruit. This evidence, however, is outweighed by contrary evidence.

Under date of March 12, 1929, eight days before this cargo was loaded and while the cargo was being prepared for shipment, the president of the libelant, Tampa Union Terminal Company, addressed a letter to the local agent of the manufacturer of the dry-cleaning machine, in which amongst other things it was said: "We find that grape fruit run through the dry cleaners supplied by you * * * are being severely damaged and we are constantly having comments coming back from the market that the fruit is soft. We have found upon examination of fruit in the bins that a very large percentage of the fruit of larger sizes are soft, this condition decreasing as the fruit decreases in size. However, in all sizes of fruit the amount of soft fruit produced by the action in the dry-cleaner is so large that we cannot continue to operate these dry-cleaners in their present form." Then follows the writer's statement of his opinion as to what part of the machine caused the damage, and suggesting that certain changes be made in the machine, to be followed by further experiments.

Under date of April 9, 1929, nineteen days after the fruit in question was loaded, another letter was written by the libelant's president to the manufacturer of the dry-cleaning machine, which contains the following statements: "These dry-cleaners never, at any time, were satisfactory or produced a commercially acceptable product, and yet, at many times there was apparently so much merit in the idea and apparently the results were so close to being commercially acceptable that we have at all times borne with your continuous experimental efforts with the hope and wish that these machines would be placed in such a condition that we could continue to use them * * *. This condition has continued to exist up to the time that Mr. Sells was in our office on March 12th, when I frankly stated to Mr. Sells that these cleaners were not satisfactory, that they were not cleaning the fruit, but, more especially, were causing great damage by reason of bruising." Then follows a reference to the former suggestion of alteration and further experiments. The letter then continues: "The results obtained from this change brought about cleaner fruit, but the amount of damage, bruising, is approximately the same. However, careful count has been kept on the quantity of fruit passed over this machine and when operating at any where near three cars of grapefruit per day the amount of bruising is very high, so much so, that it has been impossible for us to operate these machines upon many crops of fruit. * * * Buyers of fruit will not purchase grapefruit which has passed through this machine. The percentage of decay caused by bruising in oranges is higher than any known process. * * * We have been forced to suspend all operations and are now making the substitution of the first unit."

Mr. B. C. Skinner, a manufacturer of wet-washing machinery in competition with the dry-cleaning process, but otherwise a totally disinterested witness, having many years' experience in the preparation of citrus fruit for shipment, testified that he had observed the operation of the dry-cleaning machine, and that the rotary motion of the cylinder tended to pick up the fruit as high as fifteen to eighteen inches and drop it back on other fruit, causing bruising and stem puncture; that the extreme limit of fall that is considered safe is six to eight inches, the usual practice being to keep it under three inches. Mr. Skinner further testified that he made several experiments with the dry-cleaning machine and on one particular occasion he took a dozen of oranges at random as they came out of the machine, and he and Mr. Judd, president of the libelant, Tampa Union Terminal Company, examined them together and found that there were stem punctures on eleven of the twelve oranges, and that these eleven oranges had one to six punctures in each fruit.

Mr. O. S. Turner, another experienced packer of twenty-four years' experience, and a totally disinterested witness, testified that he had tried out one of these dry-cleaners in his plant, but rejected it as unsatisfactory because it bruised and injured the fruit, and forced the sawdust into the skin of the fruit, so that "I (the witness) would not think it would keep nearly as good, if it would keep at all."

Again, Mr. John L. Arnold, a totally disinterested witness, testified that he was present when the cargo in question was being loaded, and that fruit taken from a number of boxes opened by him was so soft and spongy that it could be taken between the fingers and squeezed until the top and bottom of the fruit would meet together, and that he called this to the attention of respondents' president, who discussed the same with Mr. Judd, president of the libelant.

Mr. Hyde, the special refrigerating engineer on the steamer, testified that he observed the same conditions as Mr. Arnold, and discussed the same with Mr. Judd, president of the libelant.

From the foregoing and other corroborative facts apparent in the record, the court concludes that when this cargo was loaded it was affected by inherent vice, due to the preshipment treatment stated, which rendered the fruit more than normally susceptible to decay.

It is true that respondents, having had ample opportunity to inspect the fruit and note an exception on the bill of lading, nevertheless issued a clean bill of lading acknowledging receipt of the fruit "in apparent good order and condition." That language of the bill of lading, however, under section 4 of the Harter Act (46 USCA § 193), creates only prima facie proof that the fruit, so far as visible, was not damaged. The Bencleuch (C. C. A.) 10 F.(2d) 49, certiorari denied, 271 U. S. 680, 46 S. Ct. 631, 70 L. Ed. 1148. As against the original shipper, the carrier is not estopped from showing the true condition of the shipment when received on board. The recital is not a warranty and is not conclusive as between the immediate parties. Amerlux Corp. v. Johnson Line (C. C. A.) 33 F.(2d) 70; American Finance Co. v. United States (D. C.) 55 F.(2d) 725.

On the other hand, there is convincing evidence of negligent refrigeration during the voyage.

The Tampa cargo, here involved, was stowed in refrigerated compartments of holds Nos. 1, 2, and 4, these compartments being above the lower holds and beneath the weather deck, being what is called "tween-deck" compartments. The compartments of holds Nos. 2 and 4 were completely filled with Tampa fruit. No. 1 was partly filled with Tampa fruit (about one thousand boxes), and the remaining space therein was filled with fruit loaded at Jacksonville on March 19, 1929. This Jacksonville fruit had not been subjected to the dry-cleaning process used on the Tampa fruit. The hatch-square of No. 5 hold was completely loaded with fruit at Jacksonville, there being no Tampa fruit in No. 5.

The refrigerated compartments in holds Nos. 1, 2, and 4 were cooled by an ammonia-brine system consisting of brine circulating under pressure through pipes suspended from the sides and tops of these chambers. The brine in the circulating pipes is cooled in the ship's engine room by ammonia operating under compression. There were no circulating pipes in the hatch-square of No. 5 hold, that space being cooled by leaving open doors from No. 4 compartment.

The actual temperature in the refrigerated compartments was taken by thermometers suspended in breather pipes or temperature tubes, which extend vertically from the weather deck of the vessel down into the refrigerated chambers. In the engine room were also other thermometers which registered the temperature of the circulating brine both when it starts from the compressor in the engine room and when it returns to the engine room after having been circulated through the pipes into the refrigerated compartments. These two temperatures are not to be confused, as they are in entirely different circumstances, and each performs a different function. The brine temperature will always be much lower than the temperature in the refrigerated compartments, as it is the absorption of the heat by the circulating brine which lowers the temperature in the compartments. By comparing the brine temperature when it enters the circulating pipes with the temperature when it returns to the engine room, the amount of heat it absorbs in process of circulation is disclosed, thus giving an additional check on the temperature of the refrigerated compartments.

The most desirable temperature for stored citrus fruit is thirty-six degrees. It is harmful to the fruit to permit this temperature to vary more than two degrees up or down; that is, the temperature should remain between thirty-four and thirty-eight degrees. A temperature of above thirty-eight degrees is too

warm to preserve citrus fruit, allowing softening or decay to commence, while a temperature below thirty-four tends to frost the fruit. Freezing occurs in citrus fruit at about twenty-eight or twenty-nine degrees, and thirty-one is a "critical" temperature. Also, when the temperature rises above thirty-eight degrees, the frost on the circulating pipes has a tendency to melt, causing water to drip down on the cargo below, unless the brine temperature is kept well down.

In order to regulate the temperature of the refrigerated compartments during the voyage, when they had a tendency to run too cold, both the overhead and side circulating pipes in all compartments were entirely cut off several times for substantial periods of time, though only in one instance does it appear that the compartment temperature rose above thirty-eight degrees before they were cut in again.

The deck log of the vessel shows a temperature in the refrigerated compartments either higher than thirty-eight degrees, or lower than thirty-four degrees, on the following days, and in the following compartments, these temperatures being taken by means of thermometers suspended through the breather tubes directly into the refrigerated compartments:

| Date | Compartment | Temperature |
|---|---|---|
| March 18 | 1 | 39 |
| 20 | 1 | 44 |
| 21 | 1 | 40 and 41 |
| | 2 | 32 |
| | 4 | 32 |
| 22 | 1 | 39 |
| | 4 | 33 |
| 23 | 2 | 33 |
| | 4 | 32 |
| 24 | 2 | 32 |
| | 4 | 32 |
| 30 | 2 | 33 |
| 31 | 2 | 31 |
| April 1 | 4 | 29 |
| 4 | 2 | 31 |
| 6 | 2 | 33 |
| | 4 | 33 |
| 11 | 1 | 33 |
| | 2 | 33 |
| | 4 | 33 |

It will be seen that especially in compartments Nos. 2 and 4 the temperature was much too low on several occasions, once going to twenty-nine, which is freezing for citrus fruit, while in No. 1 it was too high on several occasions, and once (April 11th) too low. No. 1 compartment was opened for several hours

at Jacksonville on March 19th while loading of the Jacksonville fruit was in progress, which no doubt accounts for the high temperature of forty-four in that compartment on the following day (the 20th). The temperatures on March 21st indicate that in an effort to bring down compartment No. 1 to thirty-eight degrees, too much refrigeration was put on for compartments Nos. 2 and 4, which had only been opened in Jacksonville for a brief period of inspection, so that Nos. 2 and 4 fell to thirty-two degrees.

The refrigerating log of the vessel, on which is recorded the brine temperatures, also shows much fluctuation. For instance, on April 1st the brine "in" was as low as seven degrees, and "out" at nine degrees; while on March 29th and 30th, the brine temperature was as high as twenty-eight degrees "in" and twenty-nine degrees "out"; on April 2d, the brine temperature fluctuated from nine degrees "in" and eleven degrees "out" to thirty degrees "in" and thirty-two degrees "out," although the brine range or "split" appears to have been kept fairly constant at one to two degrees of difference between the "in" and "out" temperatures. The lower temperature given above is that of the brine when entering the circulating coils; the higher temperature is that upon leaving the coils.

The refrigerating log, which also shows the temperature in the compartments themselves, discloses material fluctuations, notably, on March 21st, forty degrees practically all day in No. 1, and thirty-nine degrees in that compartment on March 22d; on March 25th, thirty-three degrees for eight hours in compartments Nos. 1, 2, and 4; and the same temperatures again on March 26th; on April 4th, thirty-two degrees in No. 1; on April 6th, thirty-three degrees in No. 1, thirty-two degrees in Nos. 2 and 4; on April 10th, thirty-three degrees in Nos. 1, 2, and 4, and on several other days temperatures of thirty-three degrees were shown. These temperatures unquestionably subjected the fruit to a greater range of temperature than is regarded as prudent in the storage of such fruit.

Respondents contend that there was no agreement to carry the fruit at between thirty-four and thirty-eight degrees. Telegrams and conversations shown in the evidence to have been passed between the parties prior to the loading of the fruit are tantamount to such an agreement; but if this agreement was merged in the bill of lading which does not specify the temperatures, the testimony abundantly establishes that ordinary and reasonable care and prudence required the fluctua-

tions of temperature be kept within two degrees of thirty-six, the experience of the industry being that a wider fluctuation is deleterious.

Shortly before the vessel reached London, the captain radioed, requesting a hatch survey upon arrival. When the refrigerated compartments were opened, there were present a representative of the Port of London Authority, also surveyors representing the vessel and the receivers of the fruit in London, the cargo being consigned to the order of libelant, notify Roberts Brining & Co. The vessel's chief mate, refrigerating engineer, and a special refrigerating engineer who had accompanied the vessel on the voyage, were also present.

The testimony of these witnesses presents a most pronounced conflict. The chief mate of the vessel, who opened the doors to the refrigerated compartments, the special refrigerating engineer, who accompanied the vessel, the regular refrigerating engineer of the vessel, Captain King, a surveyor representing the Port of London Authority, and Captain Bridger, representing the agents of the vessel, testified that when the doors were opened, and before bulk was broken, the refrigerated compartments were dry and in good order, except a little water in Nos. 2 and 4, the brine coils being crystal hard and frosted, with no evidence of dripping.

Captain Oliver and Captain Robertson, surveyors representing the "notify" consignees, who were present and entered the compartments at the same time, testified there was no frost on the circulating pipes, and that the coils were wet and dripping, the fruit being wet and damaged. The latter witnesses also testified positively that there was evidence of condensation in the refrigerated chambers, and that the damaged condition of the fruit was due to the temperature being kept either too high or too low during the voyage, and in general by severe wetting due to condensation. The testimony of these witnesses is irreconcilable.

It is clear, however, that the fruit arrived in a state described by all as "full maturity," and that soon after it was unloaded into the normal atmosphere, it "broke down" and much of it began to decay, and was spongy and soggy, and the paper wrappers water sodden. The Jacksonville fruit in No. 1 compartment disclosed wetted cases (apparently not from sea water), and some of the Jacksonville fruit, notably the Blue Dragon and Green Dragon brands of oranges and tangerines, showed a substantial percentage of damage and waste; the tangerines especially being found dry and withered and practically devoid of juice. These circumstances tend to establish negligent refrigeration, as the Jacksonville fruit had not been subjected to the Tampa dry-cleaning process. On the whole, however, the Jacksonville fruit, generally speaking, arrived in much better condition than the Tampa fruit. The evidence also establishes that three cargoes of citrus fruit were previously shipped under refrigeration from Tampa to London, in other steamers, all of which former cargoes were prepared for shipment by the same dry-cleaning process used on this shipment. All of these shipments arrived in London in good condition, which further tends to support the theory of negligent refrigeration on this voyage.

The evidence of the existence of actual preshipment damage to this fruit, however, resulting in inherent vice, is too strong to be ignored. The court is convinced that while there was negligent refrigeration on the voyage, the Tampa fruit was predisposed to softening and decay by the preshipment treatment above described, and that both of these causes substantially contributed and concurred to produce the softened and soggy condition of the fruit upon arrival in London, and caused it to break down and begin to decay.

On April 17, 1929, after the fruit was all unloaded, the chief mate of the vessel made the following entry in the vessel's deck log, as of April 16, 1929: "Approx. 30% of Fruit Cargo (boxes only) stained & wet caused from overhead Freezing Line in all Compartments, which is not insulated & water & frost dripping down on Top Tiers of Fruit."

Immediately following that entry, the following also appears in the deck log: "In Compartment No. 4 leaky deck caused Sea water damage to quite a number of fruit boxes."

Both libelant and respondents agree that this entry was made by the chief mate pursuant to the directions of Captain Robertson, the surveyor in London who represented the "notify" consignees. The mate specifically testified that the entries were not made of his own volition, or upon his own knowledge, but at the direction of "one of the numerous Captains" who came on the vessel as surveyors, which one he could not remember, but he thought he was a man of superior authority, whose instructions were to be obeyed. Hence, he made the entries as directed. These circumstances strip the entries of much of their probative force as evidence of the cause of

damage to the fruit. The effect of the entries, as notice to the vessel and her agents, will hereafter be referred to.

The vessel encountered two severe storms during the voyage, the first on March 28th, 29th, and 30th, when the vessel was north and east of Hatteras, and the second on April 6th, 7th, and 8th, when the vessel was "considerably southeast" of the Newfoundland Banks. According to the estimate of the ship's officers, the first storm reached a wind force of nine, which is rated on the Beaufort Scale of Mariners as a strong gale—a wind velocity of forty to forty-eight miles per hour. The second storm reached a wind force of ten, a whole gale—a velocity of fifty-six to sixty-five miles per hour. During these storms the ship labored very heavily; constantly shipped heavy seas at the bow, stern, and amidships; and had to be slowed to half speed and hauled off her course for safety. The ship's officers testified that the second storm was one of the worst they had ever encountered.

By the captain's testimony, however, it appears, from a pilot chart issued by the United States Hydrographic Office, that the number of days in the month of March on which, according to experience over an eleven-year period from 1897 to 1907, inclusive, winds of the force of eight and over have been recorded at or about the point where the first storm occurred, was eleven days; and according to the same chart the number of days in the month of March that such winds were recorded at or about the point of the second storm was twenty days.

The heavy weather encountered by the vessel made operation of the refrigerating plant more difficult than usual, and the taking of deck temperatures hazardous, sometimes impossible.

The vessel had been overhauled and converted into an oil burner, and a modern refrigerating plant installed only a few months before the commencement of the voyage in question. Routine inspection of the vessel itself had been made by representatives of the American Bureau of Shipping a short time before the voyage, and the vessel certified as seaworthy. The installation and operation of the refrigerating plant was inspected by a representative of the same bureau immediately before this voyage, and pronounced satisfactory and in good order.

Around the hatch coamings, on the weather deck, were steam feed pipes running to the deck winches, the pipes being about six inches above the weather deck. In order to protect these steam pipes, there is a steel plate about eighteen inches wide running along and above the steam pipes, this plate being mounted on steel brackets. The brackets rest upon the steel weather deck and are secured thereto with bolts and nuts, a hole being drilled through the weather deck to receive the bolts. The force of the sea coming over the weather deck and under these steel guards, during the second storm, carried away some of the supporting brackets, as well as the guards themselves, with the result that some of the bolts were torn out of their holes, leaving a number of open holes in the weather deck approximately one inch in diameter, through which sea water entered No. 4 refrigerated compartment before the holes could be plugged up.

For the damage done by sea water in No. 4 hold, the respondents are liable. Such damage was not occasioned by a peril of the sea within the meaning of the Harter Act and of the bill of lading. The exemptions of section 3 of the Harter Act (46 USCA § 192) are not available to the shipowner unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised. International N. Co. v. Farr, 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830. Seaworthiness, or due diligence to attain that condition, is a condition precedent to the exemptions of the Harter Act just mentioned. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The R. P. Fitzgerald (C. C. A.) 212 F. 678; Newhall v. United States (D. C.) 8 F.(2d) 422.

■ The burden of establishing seaworthiness, or showing due diligence to that end, is upon the shipowner. International N. Co. v. Farr, supra; The Leerdam (C. C. A.) 17 F.(2d) 586; McCahan Sugar Refining Co. v. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; Jahn v. The Steamship Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Phoenicia (D. C.) 90 F. 116; The Ninfa (D. C.) 156 F. 512; The Indrapura (C. C. A.) 190 F. 711.

Doubts upon these questions are resolved against the ship. Bradley Fertilizer Co. v. Lavender (The Edwin I. Morrison), 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688.

■ Surveyors' or inspectors' certificates of seaworthiness are not conclusive. Newhall v. United States (D. C.) 8 F.(2d) 422; Rosenberg Bros. & Co. v. Atlantic Co. (D. C.) 25 F.(2d) 739; The Abbazia (D. C.) 127 F. 495.

■ While a vessel, to be seaworthy, is not required to be impregnable or of the most improved construction, she must be reasonably fit to carry the cargo which she has undertaken to transport. The Silvia, 171 U. S.

462, 19 S. Ct. 7, 43 L. Ed. 241; The South-wark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Ninfa (D. C.) 156 F. 512; Franklin Fire Ins. Co. v. Royal Mail (C. C. A.) 58 F.(2d) 175.

Perils of the sea mean conditions which are so extraordinary or catastrophic as to overcome those safeguards by which skillful and diligent seamen ordinarily bring ship and cargo to port in safety, that is, conditions which could not have been foreseen in the exercise of reasonable prudence, or which could not have been guarded against by exertion of ordinary human skill and experience. The Rosalia (C. C. A.) 264 F. 285; The City of Dunkirk (D. C.) 10 F.(2d) 609; The Oakley C. Curtis (D. C.) 285 F. 612; The Edith (C. C. A.) 10 F.(2d) 684.

The "due diligence" required by section 3 of the Harter Act as a condition precedent to the benefits of that act, requires the owner to take such precautions as are reasonably adequate for the protection of the cargo against known perils, and against those which reasonable foresight might have anticipated. The R. P. Fitzgerald (C. C. A.) 212 F. 678, certiorari denied Taylor v. Cleveland Grain Co., 234 U. S. 757, 34 S. Ct. 675, 58 L. Ed. 1579. In the absence of that degree of diligence, the owner cannot invoke the provisions of section 3 of the Harter Act for relief. Herman v. Compagnie (C. C. A.) 242 F. 859. See, also, The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181. This requirement of due diligence is not satisfied merely by the production of surveyors' certificates of seaworthiness. Newhall v. United States (D. C.) 8 F.(2d) 422; Rosenberg Bros. & Co. v. Atlantic Co. (D. C.) 25 F.(2d) 739; The Abbazia (D. C.) 127 F. 495; Standard Oil Co. of New York v. United States (D. C.) 26 F.(2d) 385.

Where a cargo is damaged by sea water entering through rivet or bolt holes in the deck, the fact that the vessel encountered heavy seas during the voyage is not alone sufficient to support a finding that the damage was due to perils of the sea, in the absence of proof that the rivets were in good condition at the commencement of the voyage. The Citta di Palermo (D. C.) 226 F. 522, affirmed (C. C. A.) 226 F. 529.

The manner in which these steam-pipe guards were installed and secured to the weather deck was open and patent. There is no evidence that the bolts holding these guards were inspected, or that they were in good condition and free of rust or corrosion at the beginning of the voyage (Unterweser

v. Potash Corp. (C. C. A.) 36 F.(2d) 869; The Leerdam (C. C. A.) 17 F.(2d) 586; The Citta di Palermo, supra), though, of course, it is not essential to due diligence that every hidden rivet or bolt on the ship be tapped or inspected before sailing.

It is true that on the voyage in question this vessel encountered rough seas and high winds so that she rolled and pitched considerably and shipped heavy seas; but at this season of the year, following close upon the vernal equinox, such gales and seas as were encountered by this vessel were reasonably to be expected in North Atlantic waters. There is nothing so unusual or catastrophic about these storms as to excuse the vessel as for a peril of the sea. Respondents are therefore liable for the entire damage done by sea water in No. 4 hold.

As to the remaining damage to the cargo, however, resulting in the "broken down" condition of the fruit, and its state of deterioration upon arrival in London, the court is of the opinion that such damage is attributable both to inherent vice of the cargo and to negligent refrigeration during the voyage, which negligence cannot be contracted against. It is impossible to ascertain the exact proportion of damage for which each of these causes is responsible. The best that can be done in these circumstances, and what other courts have done, is to equally divide the damages between the parties, in analogy to the admiralty rule in collision cases where both parties are at fault. The Chaika (C. C. A.) 65 F.(2d) 714. Accordingly, it is held that libelant is entitled to recover only one-half of the damage other than that caused by sea water. American Finance Co. v. United States (D. C.) 55 F.(2d) 725; Stillwell v. The J. D. Hall (D. C.) 34 F. 904; The Shand (D. C.) 16 F. 570; Snow v. Carruth, Fed. Cas. No. 13,144; The Young America (D. C.) 26 F. 174; The Musselcrag (D. C.) 125 F. 786, reversed in part Corsar v. J. D. Spreckels & Bros. Co. (C. C. A.) 141 F. 260.

As to the requisite notice of damage:

The authorities draw a distinction between *notice* of damage and *claim* for damages. See Russo & Co. v. United States (C. C. A.) 40 F.(2d) 39; Anchor Line v. Jackson (C. C. A.) 9 F.(2d) 543. They perform different functions. Chicago, R. I. & P. Ry. Co. v. Williams, 101 Ark. 436, 142 S. W. 826. Strict compliance is usually required with respect to the *claim* for damage, such as was involved in The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419; Southern Pac. Co. v. Stewart, 248 U. S. 446, 39 S. Ct.

139, 63 L. Ed. 350; St. Louis, I. M. & S. R. Co. v. Starbird, 243 U. S. 592, 37 S. Ct. 462, 61 L. Ed. 917; Erie R. Co. v. Stone, 244 U. S. 332, 37 S. Ct. 633, 61 L. Ed. 1173; .and The Westminster (C. C. A.) 127 F. 680, relied upon by respondents. The rule even as to claim for damages is sometimes relaxed, however, where the shipowner knew the facts. The Natal (C. C. A.) 14 F.(2d) 382, certiorari denied 273 U. S. 748, 47 S. Ct. 449, 71 L. Ed. 872.

As to the *notice* of damage, however, with which we are here concerned, the rule is not so strict. The purpose of a notice of damage is to facilitate prompt investigation, not to afford an avenue of technical escape from liability. When this cargo was unloaded, surveyors representing the vessel's agents were present and examined the cargo, so that they were then fully aware of the existence of the damage, for which claim was later made. These surveyors immediately reported the damage found to the vessel's agents in London. The above-quoted written entries were then placed in the log by the chief mate of the vessel at the direction of the representative of the London agents of the libelant. Thus the vessel and her agents had written notice on April 17, 1929, that there had been damage to the cargo, and the vessel's representatives had actually made a complete investigation of the nature and extent of the damage. No more certain means of notice to the vessel's agents could be devised than an entry in her official log. A formal notice by letter could have accomplished nothing more, it being admitted that the vessel and her agents were fully cognizant of the existence of the damage. In this respect respondents rely solely upon the technical contention that formal and conventional notice was not sent. Libelant attempted to prove that such a notice was in fact given, but the court is not convinced that such formal notice was given.

The entries in the deck log above quoted, however, admittedly made at the direction of a representative of Roberts Brining & Co., who were receiving the fruit in London on behalf of libelant, constitute a sufficient *notice* of damage as distinguished from *claim* for damage, especially when accompanied by the attending circumstances above related. The Henry S. Grove (D. C.) 292 F. 502; Morrow v. Wabash R. Co., 219 Mo. App. 62, 265 S. W. 851; The Natal (C. C. A.) 14 F. (2d) 382, certiorari denied 273 U. S. 748, 47 S. Ct. 449, 71 L. Ed. 872; Atlantic Sugar Refineries v. Royal Mail (C. C. A.) 47 F.(2d) 880.

A decree may be presented, and settled on notice, that the libelant is entitled to recover to the extent above stated, and that the cause be referred to a commissioner to ascertain the quantum of damage.